STEPHEN J. USOZ, ESQ., SBN 189095
LESLIE HOLMES, ESQ., SBN 192608
HOGAN HOLMES & USOZ LLP
333 West Santa Clara Street, Suite 800
San Jose, California 95113
Telephone (408) 292-7600

Attorneys for Plaintiff Darrin Smolinski

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DARRIN SMOLINSKI, an individual<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PACIFIC GROVE, a public entity; PACIFIC GROVE POLICE DEPARTMENT, a public entity, SCOTT MILLER, an individual.<br><br>Defendants | Case No: C-08-01809 RMW<br><br>**APPENDIX OF NON-FEDERAL AUTHORITY**<br><br>Date: September 19, 2008<br>Time: 9:00 a.m.<br>Dept: 6<br>**Honorable Ronald M. Whyte** |

Plaintiff Darrin Smolinski hereby submits his Appendix of Non-Federal Authority cited in support of his Opposition to Defendants' Motion to Dismiss Claims Six, Seven, Eight and Ten and Strike Punitive Damages Allegations.

*J.A. Savage v. Pacific Gas and Electric Company* (1993) 21 Cal.App.4th 434

Dated: August 29, 2008           HOGAN, HOLMES & USOZ LLP


                                 /S/
                                 ─────────────────────────
                                 STEPHEN J. USOZ
                                 LESLIE HOLMES
                                 Attorneys for Plaintiff

Appendix of Non-Federal Authority

1

Page 1 of 17

Case 5:08-cv-01809-RMW    Document 28-2    Filed 08/29/2008    Page 1 of 18

21 Cal.App.4th 434, A057595, Savage v. Pacific Gas & Electric Co.

CheckMate | Case History

Page 434

# 21 Cal.App.4th 434

## 26 Cal.Rptr.2d 305

### J. A. SAVAGE, Plaintiff and Appellant,

### v.

### PACIFIC GAS AND ELECTRIC COMPANY, Defendant and Respondent.

### A057595

### California Court of Appeal, First District, First Division

### December 27, 1993

Page 435

[Copyrighted Material Omitted]

Page 436

[Copyrighted Material Omitted]

Page 437

[Copyrighted Material Omitted]

Page 438

**COUNSEL**

Scott L. Fielder, Bradlee S. Welton and Hugh B. Fielder for Plaintiff and Appellant.

Peter Arth, Anne K. Mester, Helen W. Yee and Irene K. Moosen as Amici Curiae on behalf of Plaintiff and Appellant.

Sedgwick, Detert, Moran & Arnold and Fredrick Baker for Defendant and Respondent.

Page 439

**OPINION**

NEWSOM, J.—

This is an appeal from a judgment of dismissal entered upon separate orders granting a motion for judgment on the pleadings and a motion for summary adjudication.

A journalist who formerly covered energy matters in Northern California, J.A. Savage (hereafter appellant) filed the present action against Pacific Gas and Electric Company (hereafter PG&E), three PG&E executives, David Monfried, Richard Clarke, and Dick Davin, and certain other parties on March 4, 1988. In several causes of action, she charged that the defendants interfered with the pursuit of her profession as a journalist. Following certain preliminary motions and rulings, the parties entered into a stipulation whereby appellant dismissed the complaint against the three executives and PG&E acknowledged that the executives acted within the scope of their authority as managing agents for PG&E and consented to the filing of a second amended complaint. This amended complaint, filed October 3, 1990, alleged nine causes of action: (1) conspiracy to induce breach of contract, (2) intentional interference with economic relationships, (3) conspiracy to interfere with economic relationships, (4) tortious inducement of a breach of contract, (5) intentional infliction of emotional distress, (6) intentional interference with utility ratepayers' rights, (7) slander, (8) libel, and (9) injunctive relief.

PG&E responded by moving for judgment on the pleading with respect to the sixth, seventh, and eighth causes of action. In an order dated January 8, 1992, the court denied the motion as to the seventh cause of action for slander but granted it without leave to amend as to the sixth cause of action for intentional interference with utility ratepayers' rights and with ten days' leave to amend as to the eighth cause of action for libel. Appellant did not choose to amend this cause of action.

PG&E next moved for a summary adjudication of the remaining causes of action, requesting a ruling that each cause of action "has no merit." The court granted the motion in an order dated March 6, 1992, and directed that judgment be entered "in accordance with the matters so adjudicated." Appellant moved for reconsideration. On April 17, 1992, the court denied the motion for reconsideration and entered judgment for the defendant.

In this appeal, appellant focuses her attack on the orders pertaining to the two causes of action for defamation and the cause of action for interference with ratepayers' rights. With respect to the latter, the California Public Utilities Commission appears as amicus curiae on appellant's behalf. We

Page 440

also choose to consider the causes of action for interference with contract and economic relations because they are very closely related to the defamation causes of action, but we regard any assignment of error with

regard to the first, third, fifth and ninth causes of action as waived.

Since the order granting summary adjudication had the same effect as an order granting summary judgment, we consider it under the well established principles governing review of summary judgments. We refrain from weighing the evidence but inquire only whether there are any triable issues of fact. (*Leo F. Piazza Paving Co. v. Foundation Constructors, Inc.* (1981) 128 Cal.App.3d 583, 589 [177 Cal.Rptr. 268]; *Freidberg v. Freidberg* (1970) 9 Cal.App.3d 754, 763 [88 Cal.Rptr. 451].) " 'The moving party bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory.' [Citation.] 'The affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of summary judgment should be resolved against granting the motion.' " (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 35-36 [210 Cal.Rptr. 762].)

From 1979 through 1984, appellant resided in Humboldt County where she was a PG&E ratepayer. During this time, she helped found a loosely organized group known as the Redwood Alliance, dedicated to opposing PG&E's plans for nuclear power. In the late 1970's, she appeared on local television as a representative of the group to explain its views on the decommissioning of the PG&E Humboldt Bay nuclear power plant. In 1981 and 1982, she represented the Redwood Alliance in a Public Utility Commission (PUC) proceeding, designated OII-86, which concerned among other things the financing of nuclear facility decommissioning costs. She appeared in a series of hearings on behalf of the Redwood Alliance and participated in the cross-examination of expert witnesses. In 1983, she was one of the authors of prepared testimony that the Redwood Alliance submitted to the PUC in a rate case involving the Humboldt Bay nuclear power plant.

According to appellant, she did not attend meetings of the Redwood Alliance or participate in any of its activities in 1985, and she moved to the San Francisco Bay area sometime during that year. Early in 1986, the Redwood Alliance participated in another PUC proceeding involving the Diablo Canyon nuclear power plant. It needed to appear in two pretrial hearings in San Francisco to secure the status of an intervener but was reluctant to incur the cost of sending an attorney or other representative for this limited purpose. Appellant agreed to accommodate the group by appearing on its behalf at two pretrial hearings on January 13, 1986, and July 23,

Page 441

1986. She states that she spent a total of 5.25 hours at the 2 hearings, acting as a volunteer without any expectation of payment or reimbursement for expenses. The record of the hearings discloses that her participation was limited to announcing the intention of the Redwood Alliance to intervene.

Appellant avers that from July 23, 1986, to the present, she has not participated in any further public utilities cases or attended any meetings of the Redwood Alliance. PG&E objects that these assertions are contradicted by a judicial admission: the original complaint alleged that appellant "was at all times relevant hereto, a ... member of the Redwood Alliance." Appellant urges that we disregard this allegation as "a misstatement in the pleadings drafted by [her] attorneys." We recognize that a plaintiff is generally "bound by well pleaded material allegations ...." (4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 406, p. 455)

"Where a complaint contains allegations destructive of a cause of action the defect cannot be cured by their omission without explanation in a subsequent pleading." (*Blain v. Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1058 [272 Cal.Rptr. 250].) But the record indicates that the disputed allegation was in fact virtually meaningless; the Redwood Alliance did not require payment of dues, issue membership cards, or maintain any formal accounting of membership. The "members" were only those people who rallied to its activities at a particular time. In light of this evidence, the allegation clearly could be such an inadvertent error as appellant should be allowed to correct. (4 Witkin, Cal. Procedure, *supra*, Pleading, § 411, p. 458.)

On December 29, 1986, appellant was hired by a trade publication, Energy User News, as its West Coast correspondent. Though a small publication with a circulation of only about 12,000 to 15,000, the magazine had gained a respected niche in the industry. A PG&E executive described it as being "preeminent in its field." Appellant's immediate supervisor, Cornelia Clay-Fulghum, stated that the editorial staff was informed "since the beginning" that appellant had antinuclear views. Nevertheless, she reported for the publication throughout the next 11 months without incurring any criticism for bias.

In mid-November 1987, PG&E's chief executive officer, Richard Clarke, accompanied by four other top executives, visited the editorial offices of Energy User News in New York during an annual trip to meet "with the financial community and with key reporters and editors." The executives included David Monfried, the manager of the news services department, who was responsible for media relations. It was the first time that PG&E executives had visited the magazine during their annual trip to New York and the entire editorial staff turned out for the occasion. Besides being an important

Page 442

sources of news, PG&E also bought a modest amount of advertising in the magazine.

While leaving the interview by car, PG&E executive, David Monfried, remarked to the chief executive officer, Richard Clarke, that the West Coast correspondent of Energy User News might have a conflict of interest. Clarke told Monfried to look into the matter. As events unfolded, Monfried's suspicions drew upon two sources of information—a PUC order compensating the Redwood Alliance and a conversation between a PG&E employee and a representative of the Redwood Alliance.

Several months after appellant's appearance on July 23, 1986, the Redwood Alliance actively intervened in a protracted trial of the Diablo Valley Canyon nuclear power plant case. When the PUC issued an opinion favoring its position, the Redwood Alliance secured a further PUC opinion ordering PG&E to pay it $78,387.98 as compensation for legal services and other expenses. The opinion contained an entry requiring payment of $262.50 to appellant as a "participant" in the proceeding, for 5.25 hours of work at a rate of $50 per hour.

On November 18, 1987, the day after the Energy User News interview, Dick Davin, a senior news services representative in David Monfried's department, attended a PUC hearing at which a representative of the Redwood Alliance, Larry Goldberg, appeared. During a break, the two men engaged in a brief, casual conversation that Davin related to Monfried in a telephone call later the same day. According to Davin, he asked Goldberg "if he had anyone locally." Goldberg replied, "[Y]es, J.A. Savage." When David

expressed surprise, Goldberg added that appellant "did historical information and economic comparisons." Davin was sure that Goldberg was referring to work appellant did for the Redwood Alliance and he understood Goldberg to say that she was currently working for the group.

Goldberg directly contradicted on every material point Davin's account of their conversation. In a declaration submitted in opposition to the motion for summary adjudication, Goldberg stated, "On November 18, 1987, I attended a prehearing conference held at the California Public Utilities Commission on behalf of the Redwood Alliance. After the prehearing conference I was approached by a gentleman who identified himself as being from Pacific Gas and Electric Company's (PG&E) public relations department. When I asked for his card, he said he was new in the public relations department and thus did not have one. This gentleman asked me if I knew J.A. Savage to which I responded, 'Yes.' He also asked what role she had played in the Redwood Alliance's completed Diablo Canyon Decommissioning rate case which the

Page 443

Redwood Alliance had recently been ordered compensated in. In response, I told him that she had worked in the past with the Redwood Alliance on decomissioning issues. However, I did not tell this PG&E employee that Ms. Savage was currently working for or doing research for the Redwood Alliance or that she was a member of the Redwood Alliance as these statements would have been false." Goldberg confirmed that appellant had not participated in activities of the Redwood Alliance after July 1986.

Though the sequence of events is unclear, Monfried apparently first called Cornelia Clay-Fulghum, an editor of Energy User News who was appellant's immediate supervisor. Clay-Fulghum testified that "he [Monfried] was very agitated" upon learning that appellant had been awarded compensation for her participation in the Diablo Valley Canyon case. He asked her such questions as: "don't you think that a reporter shouldn't be in this situation ...." And: "don't you think that she has a conflict of interest ...." She found the questions to be "accusatory," and she understood Monfried to be implying that appellant "lacked objectivity in reporting ...."

Monfried next raised the subject of appellant's conflict of interest in two conversations with the chief editor of Energy User News, Rick Mullin. Monfried testified, "I told the editor of Energy User News that in my opinion Ms. Savage may have a conflict of interest. Would they be interested in knowing of it." More specifically, he told Mullin "that it seemed to [him] that there was a conflict of interest because Ms. Savage was a paid intervenor on behalf of the Redwood Alliance which is opposing PG&E in key rate cases." He based his opinion on the PUC order compensating her for "participation in a PUC case" and on the conversation between Davin and Goldberg. In his view, this conversation indicated that appellant had a "continuing association" with the Redwood Alliance. He "imparted" to Mullin the information he had received from Davin regarding the conversation. Mullin generally confirmed Monfried's account of their conversation, adding that Monfried said "he had in his possession documents that indicate that [appellant] was paid to participate in this PUC hearing on behalf of the Redwood Alliance ...."

At Monfried's request, Dick Davin wrote a letter to Mullin, dated November 18, 1987, with three enclosures—the PUC order compensating the Redwood Alliance in the Diablo Valley Canyon rate case, a transcript of the pretrial hearing in this case on January 13, 1986, and a cover page on a PG&E brief dated

November 7, 1986, which listed appellant as a contact person for the Redwood Alliance in the case. In addition to noting these enclosures, the letter recounted Davin's conversation with Larry Goldberg earlier that day. Davin wrote: "Coincidentally, today I attended a pre-hearing

Page 444

conference on Diablo Canyon's Operation and Maintenance costs, which will be the subject of hearings in March of next year. A Mr. Larry Goldberg, on behalf of the Redwood Alliance, requested intervenor status. As he is from Eureka, I asked him if he had anyone locally. He said yes, J.A. Savage. He said that she does research for the Alliance, particularly on historical information and economic comparisons."

A few days later, on November 24, 1987, Mullin fired appellant as the newspaper's West Coast correspondent on the ground that she had a conflict of interest. He says that he reached this conclusion "after speaking to her, and bringing to her what seemed to be facts ...." Though denying that he was influenced by PG&E, Mullin acknowledged that prior to his discussions with Monfried he wasn't "considering firing her or discharging her ...." He formally communicated his decision to appellant in the following memo: "It has come to my attention that you have been involved with and worked for—indeed you are one of the founders of—a group called the Redwood Alliance, which has intervened in a case against Pacific Gas & Electric. I feel your association with this group, current and/or historical, constitutes a conflict of interest that irreparably compromises your objectivity as a reporter for Energy User News. Given your refusal to resign in light of this matter, I feel I must terminate your employment, effective immediately."

Soon after her discharge, appellant entered into a relationship with the Journal of Commerce whereby she would report as a free-lance stringer, paid on an article-by-article basis. The record reveals that Monfried again intervened with her editor through a telephone call and letter suggesting her bias. Again, she lost her position with the publication. Because this episode is relevant only to the cause of action for intentional interference with prospective economic advantage, we will examine it more closely in connection with our discussion of this cause of action.

We consider first the causes of action for slander and libel. At the outset, we wish to make clear our opinion that PG&E incurred no liability by conveying true copies of government documents to the editor of Energy User News, such as, copies of the PUC order compensating the Redwood Alliance in the Diablo Valley Canyon case and the transcript of the January 13, 1986, hearing. " 'An essential element of defamation is that the publication in question must contain a false statement of *fact*.' " (*Gill v. Hughes* (1991) 227 Cal.App.3d 1299, 1309 [278 Cal.Rptr. 306].) No false representation appears here.

Similarly, PG&E cannot be held liable for Monfried's expression of opinion that appellant had a conflict of interest. In defining libel and slander,

Page 445

Civil Code sections 45 and 46 both refer to a "false ... publication ...." This statutory definition can be meaningfully applied only to statements that are capable of being proved as false or true. (*Hofmann Co. v.*

*E.I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390, 397, fn. 4 [248 Cal.Rptr. 384].) We conclude that, as a matter of law, Monfried's expression of opinion does not fall within this category of statement. The determination of a conflict of interest involves instead an application of an ethical standard to facts, reflecting the exercise of judgment. The judgment may, of course, be reasonable or unreasonable; but whatever quality may be attributed to it, the expressed belief in the existence of a conflict of interest does not imply an objective fact that can be proved to be true or false.

Since the statements at issue here involved a matter of purely private concern communicated between private individuals, we do not regard them as raising a First Amendment issue. "While such speech is not totally unprotected by the First Amendment [citation], its protections are less stringent" [than that applying to speech on matters of public concern]. (*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* (1985) 472 U.S. 749, 760 [86 L.Ed.2d 593, 603, 105 S.Ct. 2939]; *Mosesian v. McClatchy Newspapers* (1991) 233 Cal.App.3d 1685, 1694 [285 Cal.Rptr. 430].) We note, however, that our interpretation of Civil Code sections 45 and 46 will avoid constitutional issues where matters of public concern are involved. (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 19-21 [111 L.Ed.2d 1, 18-19, 110 S.Ct. 2695]; *Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1607-1609 [284 Cal.Rptr. 244]; *Weller v. American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 1000-1001 [283 Cal.Rptr. 644]; *Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 724-725 [275 Cal.Rptr. 494]. Accordingly, this construction of the statutes is favored by the principle that the court may reasonably impute to the Legislature a meaning that best avoids conflict with constitutional limitations. (*Balmoral Hotel Tenants Assn. v. Lee* (1990) 226 Cal.App.3d 686, 697 [276 Cal.Rptr. 640].)

There remains the issue of PG&E's communication of Davin's account of his conversation with the Redwood Alliance representative, Larry Goldberg. The issue turns on the accuracy of Davin's account, not the accuracy of Goldberg's information. In conveying the conversation to Mullin, the PG&E executives represented only that a knowledgable member of the Redwood Alliance had made the statements Davin attributed to him; it did not vouch for the accuracy of the information or claim independent knowledge. For PG&E to establish the defense of truth, it need only prove that Goldberg said what Davin claimed he said.

We consider that the record presents a triable issue of fact as to the truth of Davin's account of his conversation with Goldberg. We recognize that

Page 446

PG&E need only show that Davin's account was substantially accurate, "irrespective of slight inaccuracy in the details." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 495, p. 584; *Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496 [115 L.Ed.2d 447, 111 S.Ct. 2419].) But the two men offered widely conflicting testimony regarding the conversation; and on review of a summary judgment, "... the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion." (*Stationers Corp. v Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449]; *Sprecher v. Adamson Companies* (1981) 30 Cal.3d 358, 373 [178 Cal.Rptr. 783].) Construing Goldberg's declaration liberally, the record would support the inference that Davin gave a false account of his conversation with Goldberg. This false account was then conveyed to Mullin through Monfried's telephone calls and Davin's own letter.

The question thus becomes whether PG&E can be liable for defamation by communicating to appellant's editor a false account of the Davin-Goldberg conversation. We hold that it may. Civil Code section 45 defines libel as a false written publication "which has a tendency to injure [a person] in his occupation." Similarly, Civil Code section 46 defines slander as a false oral communication which "[t]ends directly to injure [a person] in respect to his office, profession, trade or business ...." There can be no doubt that a statement charging a journalist with conduct which is generally regarded as unethical under accepted journalistic standards would have a tendency to cause professional injury. (Cf. *Kelly v. General Telephone Co.* (1982) 136 Cal.App.3d 278, 285 [186 Cal.Rptr. 184]; *Albertini v. Schaefer* (1979) 97 Cal.App.3d 822, 829 [159 Cal.Rptr. 98]; *Hanley v. Lund* (1963) 218 Cal.App.2d 633, 644 [32 Cal.Rptr. 733], overruled on other grounds in *Adams v. Murakami* (1991) 54 Cal.3d 105, 115 [284 Cal.Rptr. 318].)

Appellant points to evidence in the record indicating that the dual role attributed to appellant—working for an association intervening against PG&E in a PUC proceeding while reporting on PG&E policies—would be regarded by other journalists as a serious breach of journalistic ethics. Davin testified that "anybody" would regard it as unethical. He explained, "A reporter can call PG&E and get all kinds of information. An intervenor calling me would be referred to our lawyers ...." Monfried observed, "I believe it's perfectly acceptable for a reporter to have political or other leanings one way or another .... I think it is a very different matter than a reporter being paid to represent an advocacy on one side while representing herself to her readers as objective." Edwin R. Bayley, former dean of the

Page 447

Graduate School of Journalism at the University of California at Berkeley, stated: "[I]t is also my opinion that a false accusation that a reporter was a paid participant in a legal action involving a utility at the same time she was employed as a reporter whose assignment was to cover that utility would be very damaging to that journalist's career ...." Appellant's editor, Cornelia Clay-Fulghum, concurred that it was a "pretty serious" accusation.

It is immaterial that the statements attributed to Goldberg may not be defamatory on their face. The defamatory character of language is measured "according to the sense and meaning ... which such language may fairly be presumed to have conveyed to those to whom it was published." (*MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 546-547 [343 P.2d 36]; *Slaughter v. Friedman* (1982) 32 Cal.3d 149, 154 [185 Cal.Rptr. 244]; *Barnes-Hind, Inc. v. Superior Court* (1986) 181 Cal.App.3d 377, 386 [226 Cal.Rptr. 354].) In the words of Restatement Second of Torts, section 563, "[t]he meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express."

Thus, the courts have traditionally recognized that statements may be libelous "if the reader would be able to recognize a defamatory meaning only by virtue of his or her knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons ...." (*Barnes-Hind, Inc. v. Superior Court, supra,* 181 Cal.App.3d 377, 387.) "For example, a newspaper might erroneously report that 'Mrs. A gave birth to a child last night.' Mrs. A has been married only a month. The language used will take on a defamatory meaning only to those who know when Mrs. A was married ...." (*MacLeod v. Tribune Publishing Co., supra,* 52 Cal.2d at p. 550.) In this respect, we see no distinction today between the law of libel and slander. In either case,

the fact that a statement is not defamatory on its face requires only that the plaintiff plead and prove the defamatory meaning and special damages. (Civ. Code, §§ 45a and 46; 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 493, p. 580; BAJI No. 7.09 (1991 rev.).)

The trier of fact here might reasonably find that the parties attached a defamatory meaning to the statement attributed to Goldberg. The statement was conveyed from one journalist to another, and both evidently understood the ethical implications of a conflict of interest. In view of facts known to them, the statement implicated appellant in unethical conduct. Hence, we conclude that the record presents a triable issue of fact as to whether PG&E is liable to appellant for slander and libel by communicating a false and defamatory account of the Davin-Goldberg conversation through Monfried's telephone calls and Davin's own letter to Mullin.

Page 448

We note that, following *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 347 [41 L.Ed.2d 789, 809, 94 S.Ct. 2997], the plaintiff must also prove that the defendant was at fault in making a defamatory statement "injurious to a private individual." (Fn. omitted.) Thus appellant must prove that the PG&E executive intended to defame her or that PG&E was at least negligent in failing to ascertain the falsity of the statement or the existence of extrinsic circumstances making the statement defamatory. (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 747 [257 Cal.Rptr. 708]; Rest.2d Torts, § 580B.) This additional requirement, however, does not enter into the present appeal. In seeking summary adjudication, PG&E never claimed to be free of fault in making a defamatory statement but rather relied on the theory that the statements were true or nonactionable.

Though requiring a different analysis, the question of PG&E's liability under the cause of action for interference with contractual relations ultimately rests on the same disputed issues of fact as presented by the theory of defamation. The closely related tort of interference with prospective economic advantage, however, presents a new and significant issue, to the extent that it extends to the alleged interference with appellant's status as a free-lance stringer for the Journal of Commerce.

As stated by our high court, the elements of a cause of action for intentional interference with contractual relations are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1].) The elements of a cause of action for intentional interference with prospective economic advantage differ only to the extent that this tort presupposes " 'an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff ....' " (*Id.* at p. 1126, fn. 2.) Further distinctions may be found in the area of affirmative defenses: "... a broader range of privilege to interfere is recognized when the relationship or economic advantage interfered with is only prospective." (*Id.* at p. 1126.)

The tort of interference with contractual relations may be based upon appellant's employment relationship with Energy User News even if it is regarded as a contract at will—a matter on which we

express no opinion. "Reviewing courts have reiterated in case after case that the contractual relationship is at the will of the parties, not at the will of outsiders." (*Pacific Gas & Electric Co. v. Bear Stearns & Co.*, supra, 50 Cal.3d at 1127; *Speegle*

Page 449

*v. Board of Fire Underwriters* (1946) 29 Cal.2d 34, 39 [172 P.2d 867].) Appellant did not have a contractual relationship with the Journal of Commerce, and it was not obliged to compensate her or to accept her articles. The newspaper merely placed her on a list of reporters privileged to submit articles that would be reviewed for publication. Nevertheless, she did enjoy "an economic relationship" with the newspaper offering "the probability of future economic benefit" because she could expect to be paid for those articles accepted for publication.

As noted above, both torts require intentional acts designed to interfere with a contractual or economic relationship. (*Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752, 765-766 [206 Cal.Rptr. 354].) "Intent, of course, may be established by inference as well as by direct proof." (*Id.* at p. 767.) Thus, the jury may "infer culpable intent from conduct 'substantially certain' to interfere with the contract [or prospective economic relationship]." (*Ibid.*)

Decisions in this field frequently state that a cause of action under either tort theory "will lie for the intentional interference by a third person with a contractual relationship either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification." (*Herron v. State Farm Mutual Ins. Co.* (1961) 56 Cal.2d 202, 205 [14 Cal.Rptr. 294]; *Walsh v. Glendale Fed. Sav. & Loan Assn.* (1969) 1 Cal.App.3d 578, 588 [81 Cal.Rptr. 804], overruled on other grounds in *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1975) 9 Cal.3d 731, 737 [108 Cal.Rptr. 845, 63 A.L.R.3d 39]; *Lowell v. Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 18 [144 Cal.Rptr. 664, 6 A.L.R.4th 184].) These considerations, however, do not appear in the definition of the tort but rather are relevant to the issue of "justification," which must be pleaded as an affirmative defense. (*Herron v. State Farm Mutual Ins. Co., supra*, 56 Cal.2d 202, 207; *Bert G. Gianelli Distributing Co. v. Beck & Co.* (1985) 172 Cal.App.3d 1020 [219 Cal.Rptr. 203]; *A.F. Arnold & Co. v. Pacific Professional Ins., Inc.* (1972) 27 Cal.App.3d 710, 715 [104 Cal.Rptr. 96]; cf. Rest.2d Torts, § 766.) If the means are unlawful, the interference cannot be justified and is beyond the reach of this affirmative defense. Unlawful means include defamation and other forms of tortious conduct. (*Imperial Ice Co. v. Rossier* (1941) 18 Cal.2d 33, 35 [112 P.2d 631]; *A.F. Arnold & Co. v. Pacific Professional Ins., Inc., supra*, 27 Cal.App.3d 710, 716; *Blender v. Superior Court* (1942) 55 Cal.App.2d 24 [130 P.2d 179].)

In this connection, the courts recognize a rule directly analogous to the defense of truth in causes of action for defamation. A person cannot incur liability for interfering with contractual or economic relations by giving

Page 450

truthful information to a third party. (*Bert G. Giannelli Distributing Co. v. Beck & Co., supra*, 172 Cal.App.3d 1020, 1057, fn. 15; *Masoni v. Board of Trade of S.F.* (1953) 119 Cal.App.2d 738, 743 [260

P.2d 205]; Rest.2d Torts, § 772; Prosser & Keeton, The Law of Torts (5th ed. 1984) § 129, p. 989.)

In applying these principles to the present case, we have no difficulty in concluding that the record in general presents a triable issue of fact with regard to the elements of the torts of interference with contractual relations and interference with prospective economic advantage, including the element of intentional conduct. The trier of fact could reasonably find that the PG&E executive's conduct was substantially certain to interfere with appellant's interests, and infer culpable intent from this fact. The more difficult issues concern the defense of justification. Our analysis of these issues leads to the same conclusions we have reached in our discussion of defamation: PG&E cannot be liable for conveying to the editor of Energy User News truthful copies of government documents or an accurate account of Davin's conversation with Goldberg, but it may be held liable upon a finding that Monfried and Davin defamed appellant by conveying a false account of the Davin-Goldberg conversation.

The significance of an expression of opinion presents a novel issue in this context. In view of his influential position, Monfried may well have caused appellant to lose her job by expressing to her editor an unfounded opinion to the effect that she was engaged in unethical conduct. Still, we see a social value in allowing business contacts of enterprises dealing with the public to comment freely on matters affecting their own or the public interest. (See *Imperial Ice Co. v. Rossier, supra,* 18 Cal.2d 33, 35; *Willis v. Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806, 810 [26 Cal.Rptr. 640], overruled on other grounds in *Cianci v. Superior Court* (1985) 40 Cal.3d 903, 925 [221 Cal.Rptr. 575]; *Freed v. Manchester Service, Inc.* (1958) 165 Cal.App.2d 186, 190 [331 P.2d 689].) Thus, in *Allen v. Safeway Stores, Inc.* (Wyo. 1985) 699 P.2d 277, the court held that a state official was justified in notifying the management of Safeway Stores that a particular store manager was mistreating participants in a food supplement program. It might be thought that an expression of opinion may sometimes be so absurd or trivial as not to serve any social interest. But we cannot find that Monfried's expression of opinion was unjustified on this rationale without evaluating the reasonableness of the opinion. Such a critique of his opinion, touching closely on First Amendment interests, would be not only futile but unwarranted by existing case law. (Cf. *Hofmann Co. v. E.I. Du Pont de Nemours & Co., supra,* 202 Cal.App.3d 390, 397.)

We turn now to the issue that pertains only to the cause of action for interference with prospective economic advantage: the alleged interference

Page 451

with appellant's position as a free-lance stringer for the Journal of Commerce. As in many other cases in this field (e.g., *Speegle v. Board of Fire Underwriters, supra,* 29 Cal.2d 34), appellant's right of recovery depends ultimately on whether PG&E acted unlawfully. The practical importance of this consideration prompted the authors of the Restatement of Torts to include improper conduct in the definition of the tort. (Cf. *Blank v. Kirwan* (1985) 39 Cal.3d 311, 330 [216 Cal.Rptr. 718], and Rest.2d Torts, § 766B.) The record clearly presents a triable issue of fact as to each of the elements of the tort; the principal area of dispute concerns the justification for PG&E's action. Such justification can be precluded if PG&E acted unlawfully.

Shortly after appellant began working for the newspaper, PG&E executive, David Monfried, informed

undoubtedly do the same with information obtained while writing for the *Journal of Commerce*."

Case 5:08-cv-01809-RMW    Document 28-2    Filed 08/29/2008    Page 12 of 18

Appellant contends that PG&E's act of excluding her from the ranks of journalists with whom it would cooperate violated Public Utilities Code section 453, subdivision (a). The statute provides: "No public utility shall, as to rates, charges, service, facilities, or in any other respect, make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage."

As authoritatively construed in *Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458 [156 Cal.Rptr. 14], Public Utilities Code section 453, subdivision (a), draws "upon the well-established common law doctrine that a monopoly is not free to exercise its power arbitrarily ...." (24 Cal.3d at p. 476.) The court observed, "Since medieval times, the common law has imposed various obligations upon enterprises that exercise monopoly power to assure that such power is not exerted in an arbitrary or discriminatory manner.... [T]his ... doctrine evolved into a broad common law principle which placed numerous obligations,

Page 452

including an obligation to avoid discriminatory conduct, upon enterprises said to be 'affected with a public interest.' [Citations.] [¶] Although the outer boundaries of the 'public service enterprise' category have not been precisely delineated, in contemporary times a public utility, such as PT&T, undoubtedly constitutes a paradigm example of an enterprise 'affected with the public interest.' " (*Ibid.*)

The issue before the court in the *Gay Law Students* decision was whether Public Utilities Code section 453, subdivision (a), prohibited Pacific Telephone and Telegraph Company from engaging in arbitrary discrimination against homosexuals in the hiring, promotion or termination of employees. Holding that it did prohibit this discrimination, the court rejected an argument that the statute proscribed discrimination only in the area of "rates, services or other consumer-related functions ...." (24 Cal.3d at p. 477.) First, the court noted that such a narrow construction is "difficult to reconcile with the explicit broad language of the provision. As we have seen, the statute provides that '[n]o public utility shall, as to rates, charges, service, facilities *or in any other respect* ... subject any ... person to any prejudice or disadvantage.' " (*Id.* at p. 478.) The statute must be construed "to give full effect to the broad, emphasized language of the provision." (*Ibid.*)

Second, the court observed that the legislative history "evidenced a clear intent to preclude *all* discriminatory practices by regulated utilities.... [¶] After initially enacting legislation that proscribed rate or service discrimination, the Legislature consciously broadened the statutory prohibition to bar utility

her editor, John Maggs, that he could not cooperate with appellant for the express reason that she had written two articles for a newspaper critical of PG&E, the San Francisco Bay Guardian. Monfried testified, "I informed Mr. Maggs that as a matter of policy, PG&E does not cooperate with 'The Bay Guardian' or with any of its reporters. That would, of course, include Ms. Savage." Monfried sent copies of the articles to Maggs. A cover letter transmitting one of the articles complained, "Frankly, John, I don't know how we can cooperate with Ms. Savage on *any* story—note, for instance, that she uses, in this story and in the previous one I sent you, information obtained while reporting for *Energy User News*. She would

discrimination 'in any respect whatsoever ....' " (24 Cal.3d at pp. 479-480.)

Third, the court relied on *James v. Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900], which applied the common law doctrine restricting monopoly power to discrimination in employment as well as in rates and service. Although the issue of employment discrimination is not before us in this appeal, the court stressed certain language in the *Marinship* decision which has some relevance here: " ' "The question in the instant case is not one of prices or of serving the public but one of employment.... However, the principle is the same; the holders of the monopoly must not exercise their power in an arbitrary, unreasonable manner so as to bring injury to others. The nature of the monopoly determines the nature of the duty." ' " (*Gay Law Students Assn. v. Pacific Tel & Tel. Co.*, supra, 24 Cal.3d at p. 482, italics omitted.)

Finally, the court stated that the statute could reasonably be construed as prohibiting forms of discrimination recognized as unconstitutional. In an

Page 453

earlier portion of the decision, the court had held that California Constitution article I, section 7, subdivision (a), prohibited a public utility from engaging in employment discrimination against homosexuals. This holding, the court reasoned, favored an interpretation of Public Utilities Code section 453, subdivision (a), as also prohibiting such discrimination: "... the constitutional analysis set forth [above], supports a construction of section 453, subdivision (a) that prohibits arbitrary employment discrimination by a state-protected public utility.... [T]he language of section 453, subdivision (a) is broad and unrestricted and the legislative history suggests that the Legislature intended to impose general restrictions on discrimination by public utilities. Under these circumstances, we believe that the constitutional considerations discussed [above] constitute a strong basis for interpreting the existing statute as barring such discrimination." (*Gay Law Students Assn. v. Pacific Tel. & Tel. Co.*, supra, 24 Cal.3d at p. 485.)

In effect, the court states that Public Utilities Code section 453, subdivision (a), can reasonably be construed as making certain general constitutional restrictions directly applicable to public utilities without a finding of the state action required to base a remedy on the Constitution itself. Thus, constitutional restrictions applying to the state or other government entities become relevant to interpretation of the statute.

"Discriminatory governmental action aimed at the communicative impact of expression is presumptively at odds with the First Amendment." (*Times-Picayune Publishing Corp. v. Lee* (E.D. La. 1988) 15 Med.L.Rptr. 1713, 1719; *Sherrill v. Knight* (D.C. Cir. 1977) 569 F.2d 124, 129 [186 App.D.C. 293].) "While public officials need not furnish information, other than public records, to any news agency, a public official may not constitutionally deny to one media access that is enjoyed by other media, because one media is entitled to the same right of access as any other." (*Southwestern Newspapers Corp. v. Curtis* (Tex.Civ.App. 1979) 584 S.W.2d 362, 364-365; *American Broadcasting Companies, Inc. v. Cuomo* (2d Cir. 1977) 570 F.2d 1080, 1083; *Westinghouse Broadcasting Co., Inc. v. Dukakis* (D.Mass. 1976) 409 F.Supp. 895.)

"The danger in granting favorable treatment to certain members of the media is obvious: it allows the government to influence the type of substantive media coverage that public events will receive. Such a practice is unquestionably at odds with the First Amendment." (*Anderson v. Cryovac, Inc.* (1st Cir. 1986) 805 F.2d 1, 9.) Public officials of course have a right to criticize the press. "But when criticism transforms into an attempt to use the powers of governmental office to intimidate or to discipline the press or one of its members because of what appears in print, a compelling governmental

Page 454

interest that cannot be served by less restrictive means must be shown for such use to meet Constitutional standards." (*Borreca v. Fasi* (D.Hawaii 1974) 369 F.Supp. 906, 910; *Stevens v. New York Racing Ass'n., Inc.* (E.D.N.Y. 1987) 665 F.Supp. 164, 175; *North Mississippi Commmunications, Inc.* v. *Jones* (5th Cir. 1986) 792 F.2d 1330, 1337.)

Thus, the courts have found violations of the First Amendment where a mayor excluded reporters for a particular newspaper from major press conferences to which the press generally was invited (*Borreca v. Fasi, supra,* 369 F.Supp. 906), where a district attorney required reporters for a disfavored newspaper to obtain advance appointments not required of other reporters (*Southwestern Newspapers Corp. v. Curtis, supra,* 584 S.W.2d 362), where a racetrack reporter was forbidden to carry a camera into paddock areas otherwise open to the press (*Stevens v. New York Racing Ass'n., Inc., supra,* 665 F.Supp. 164), and where a sheriff directed his staff not to respond to questions of reporters from the plaintiff newspaper unless they were submitted in writing. (*Times-Picayune Publishing Corp. v. Lee, supra,* 15 Med.L.Rptr. 1713.)

The frequently cited decision, *Quad-City Community News Service, Inc. v. Jebens* (S.D.Iowa 1971) 334 F.Supp. 8 analyzed discriminatory treatment of the press under both the First Amendment and the equal protection clause. City officials had denied reporters for an underground newspaper access to police files generally available to other reporters. After finding that the action violated the First Amendment, the court addressed the equal protection issue: "No showing merely of a rational relationship to some colorable state interest suffices to justify a classification between media permitted access to the reports and others which are not so permitted. Any classification which serves to penalize or restrain the exercise of a First Amendment right, unless shown to be necessary to promote a *compelling* governmental interest is unconstitutional." (*Id.* at p. 15.)

Having a status similar to the defendant in the *Gay Law Students* case, PG&E enjoys "a state-protected monopoly" throughout much of Northern California which "derives directly from its exclusive franchise provided by the state." (*Gay Law Students Assn. v. Pacific Tel. & Tel. Co., supra,* 24 Cal.3d at p. 471.) Its monopoly over gas and electrical service in this area "is guaranteed and safeguarded by the state Public Utilities Commission, which possesses the power to refuse to issue certificates of public convenience and necessity to permit potential competition to enter these areas ...." (*Ibid.*) Because its monopolistic position extends over a large and economically vital geographical area, PG&E wields considerable power over the press covering its activities. Without access to PG&E as a news source, a journalist in this field is severely handicapped in the competitive search for news.

Page 455

Its power was dramatically illustrated by the present case. Appellant lost two successive jobs covering the public utilities industry on the west coast after PG&E executive, David Monfried, informed her editors that she was *persona non grata* with corporate management.

In the case of a public utility enjoying such extensive monopolistic authority "affected with a public interest," there is an important public interest in assuring freedom of the press in reporting on matters lying within the exercise of its franchise. We recall the words of Justice Douglas in *Terminiello v. Chicago* (1949) 337 U.S. 1, 4 [93 L.Ed. 1131, 1134-1135, 69 S.Ct. 894]: "The vitality of civil and political institutions in our society depends on free discussion.... The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes. [¶] Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.... There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas ...."

As construed in *Gay Law Students*, Public Utilities Code section 453, subdivision (a), reflects a public utility's duty to exercise its franchise in the public interest by broadly prohibiting discrimination action that may "subject any ... person to any prejudice or disadvantage." We conclude that it is consistent with this statutory purpose to construe Public Utilities Code section 453, subdivision (a), as prohibiting retaliatory measures against journalists or newspapers based on the content of their reporting on matters lying within the exercise of PG&E's franchise. This conclusion is supported by our constitutional analysis. The broad statutory language of Public Utilities Code section 453 may be reasonably construed as applying to the kind of discriminatory treatment of the press prohibited by the First Amendment and equal protection clause.

PG&E objects that its own First Amendment right "to express its opinion on a subject of importance to the company" is at stake. We agree that Public Utilities Code section 453, subdivision (a), should not be construed so as to infringe on a public utilities own right of free expression. Unquestionably, PG&E has wide latitude to choose the forum, manner, and extent of its disclosures to individual journalists. But the facts of the present case do not present any issue of reconciling PG&E's own First Amendment rights with the public interest in free debate. PG&E's action in effectively blacklisting appellant served no legitimate First Amendment purpose.

We recognize that a private corporation generally has unrestricted freedom in dealing with the press. But a public utility, occupying a significant

Page 456

monopolistic position over an essential public service, occupies an exceptional role. As stated in the *Gay Law Students* decision, "[i]n California a public utility is in many respects more akin to a governmental entity than to a purely private employer. In this state, the breadth and depth of governmental regulation of a public utility's business practices inextricably ties the state to a public utility's conduct, both in the public's perception and in the utility's day-to-day activities. [Citation.] Moreover the nature of the California regulatory scheme demonstrates that the state generally expects a public utility to conduct its affairs more

like a government entity than like a private corporation.... Under these circumstances, we believe that ... a public utility may not properly claim prerogatives of 'private autonomy' that may possibly attach to a purely private business enterprise." (*Gay Law Students Assn. v. Pacific Tel. & Tel. Co.*, supra, 24 Cal.3d at pp. 469-470.)

Our conclusion that PG&E executive, David Monfried, may have acted improperly in intervening with appellant's editor at the Journal of Commerce fortifies our earlier conclusion that the trial court erred in dismissing appellant's cause of action for intentional interference with prospective economic advantage. As noted above, the record plainly presents a triable issue of fact with respect to the elements of this cause of action.

Lastly, in her sixth cause of action, appellant claims a right of recovery under Public Utilities Code sections 453, 454, and 2106 for interference with her rights as an intervener. [1] Whether or not such a cause of action exists, we see no support for appellant's theory on the record. The evidence suggests only that the PG&E executives were unhappy with a perceived conflict of interest and the content of appellant's reporting for the San Francisco Bay Guardian. Since the trial court dismissed the cause of action on a motion for judgment on the pleading, she claims the benefit of the rule that all material facts alleged in the pleading must be accepted as true. (*Barbara A. v. John G.* (1983) 145 Cal.App.3d 369, 374 [193 Cal.Rptr. 422].) The complaint in fact does allege that PG&E acted with "the intention of intimidating present and future intervenors ...." But the sixth cause of action is based on the same events as the other tort causes of action. Under these circumstances, we consider it appropriate to take judicial notice of "competent evidence of record in the lower court" in reviewing the motion. (*Tiffany v. Sierra Sands Unified School Dist.* (1980) 103 Cal.App.3d 218, 225 [162 Cal.Rptr. 669].) This evidence reveals no factual basis for her legal theory.

The judgment is reversed insofar as it dismisses the second cause of action for intentional interference with prospective economic advantage, the fourth

Page 457

cause of action for interference with contractual relations, the seventh cause of action for slander, and the eighth cause of action for libel. In all other respects the judgment is affirmed. Costs to appellant.

Strankman, P. J., concurred.

**STEIN, J.,—**

Concurring.—I express no opinion on the application of Public Utilities Code section 453, subdivision (a) to the facts of the case.

I concur in the result.

Respondent's petition for review by the Supreme Court was denied March 17, 1994. Baxter, J., did not participate therein.

---

Notes:

[1] We do not reach the constitutional issues raised by the California Public Utilities Commission as amicus curiae, as they were not raised in the trial court.

---